IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SIERRA NEVADA FOREST PROTECTION CAMPAIGN, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>WEINGARDT, et al.,<br><br>    Defendants. | CIV-S-04-2727 DFL KJM<br><br>MEMORANDUM OF OPINION<br>AND ORDER |
| CONSERVATION CONGRESS, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>UNITED STATES FOREST SERVICE,<br><br>    Defendant. | CIV-S-05-0093 DFL JFM<br><br>MEMORANDUM OF OPINION<br>AND ORDER |

Plaintiffs in these two cases allege that the defendant United States Forest Service[1] violated the National Environmental Policy Act ("NEPA") by failing to circulate a draft environmental assessment ("EA") or otherwise involve the public "to the extent practicable" in the preparation of the EA. The parties in both cases have filed cross-motions for summary judgment. Although these cases are not consolidated, they raise the same legal issues and the court finds it expedient to issue a joint opinion.[2]

I.

A. The North 49 Project

Plaintiffs Sierra Nevada Forest Protection Campaign (the "Sierra Nevada Campaign"), Sierra Club, and Lassen Forest Preservation Group ("Lassen Group") allege that the Forest Service violated NEPA, the Appeals Reform Act ("ARA"), and the Administrative Procedure Act ("APA") in approving the North 49 project in the Lassen National Forest. The North 49 project involves the logging of approximately 14,000 acres. (Sierra AR

---

[1] The defendants in Sierra Nevada v. Weingardt are Deputy Regional Forester Bernard Weingardt, the United States Forest Service, and the United States Department of Agriculture. The United States Forest Service is the sole defendant in Conservation Congress v. United States Forest Service. All defendants will be collectively referred to as the "Forest Service."

[2] Sierra Nevada v. Weingardt, No. 04-2727, was submitted on June 1, 2005; Conservation Congress v. United States Forest Service, No. 05-0093, was submitted on June 22, 2005. All parties ask the court to rule by June 30, 2005 because of pending timber contracts.

2

416-417.)  The stated "purpose and need" for the North 49 project is to restore fire-adapted forest ecosystems and reduce the risk of wildfires.  (Id.)

The Sierra Nevada Campaign and the Lassen Group notified the Forest Service of their interest in the North 49 project by letter in February 2004.  (Sierra Pls.' Mot. at 7.)  As a result, both organizations received a March 16, 2004 mailing from the Forest Service, which stated that the North 49 project was under consideration, generally described the project, and invited "input" on the proposed action.  (Sierra AR 1.)  The thirteen-page document accompanying the letter, referred to as a "scoping notice," included a description of the proposed action and approximately two and one-half pages of discussion of anticipated mitigation measures that would reduce impacts to wildlife, cultural resources, and watersheds.  (Id. at 2-14.)  The Sierra Nevada Campaign and Lassen Group both submitted timely comments in response to this mailing suggesting certain topics that should be covered by any environmental review of the project and requesting a copy of any draft EA or environmental impact statement ("EIS").  (Id. at 39-50.)

On May 11, 2004, the Forest Service sent another letter to plaintiffs stating that it was initiating a second public comment period as required by 36 C.F.R. § 215.6.[3]  (Id.)  After the close

---

[3] The "Appeals Rule," 36 C.F.R. § 215 et seq, requires notice and comment periods for certain Forest Service actions. Specifically, the Rule provides that, for Forest Service actions that will be analyzed in an EA, "[c]omments on the proposed action shall be accepted for 30 days following the date of

3

of public comment, the Forest Service prepared a series of internal reports, totaling more than three hundred pages, that evaluated the potential impacts of the proposed North 49 project, including impacts on silvicultural resources, wildlife, hydrology, sensitive plants, aquatic species, and visual resources.  (Id. 95-413.)  From these reports, the Forest Service prepared a fifty-page EA discussing the impacts of the project, including the cumulative impacts, as well as alternatives to the project in light of the information in the reports.

The EA was released to the public on August 20, 2004. (Sierra Pls.' Mot. at 9.)  At the same time, the Forest Service issued a "Finding of No Significant Impact" ("FONSI") under NEPA and a Decision Notice approving the project.  (Id.; Sierra AR 464-73.)  On October 4, 2004, plaintiffs filed an administrative appeal of the decision to approve the North 49 project.  (Sierra AR at 483-965.)  The appeal was dismissed without review by defendant Weingardt on the ground that none of the plaintiffs submitted substantive comments during the § 215.6 public comment period, even though plaintiffs had submitted comments before the beginning of the comment period.  (Id. at  966.)

Plaintiffs filed this action on December 28, 2004, making the following two claims against the Forest Service: (1) the failure to circulate a draft EA for public comment violated NEPA and the APA; and (2) dismissal of plaintiffs' appeals violated

---

publication of the legal notice."  36 C.F.R. § 215.6 (2004).

4

the APA and the ARA.  (FAC ¶¶ 37-48.)  Plaintiffs seek declaratory and injunctive relief.

### B. The Eagle Ranch, Edson, and Powder Projects

Plaintiffs Conservation Congress, Klamath Forest Alliance, and Citizens for Better Forestry challenge the Forest Service approvals of three timber projects in the Shasta-Trinity National Forest: the Eagle Ranch, Powder, and Edson projects.

#### 1. The Eagle Ranch Project

The Eagle Ranch project is located in Trinity County and involves logging of 117 acres.  (Conservation AR 140.)  The stated purpose and need for the project is to maintain and improve the health and vigor of forested areas and reduce the risk of wildfires.  (Id. at 137.)  The project was originally proposed in 1998, and it was initially planned that the EA would be circulated for public comment in July 1999.  (Id. at 11-14.)  The project was evidently delayed for reasons not in the record and a public scoping notice for the project was not distributed until March 19, 2004.  (Id. at 21.)  The notice contained three pages of information about the project and a map, but no analysis of the environmental impacts of the project.  (Id. at 21-24.)  Conservation Congress submitted five pages of comments in response to the notice, suggesting issues that should be addressed in an EA or EIS.  (Id. at 29-35.)  Three expert reports were subsequently prepared to analyze the impacts of the project.  (Id. at 47-134.)  The EA was completed on July 2, 2004.  (Id. at 135-169.)  The Forest Service initiated a second public comment

5

period, pursuant to 36 C.F.R. § 215.6, on July 6, 2004 with a one-page letter requesting comments. However, the Forest Service did not make the already-completed expert reports or EA available to the public. Instead, the § 215.6 letter contained only a one-sentence description of the project. (Id. at 171.) Additional expert reports were completed during the 30-day public comment period, but none of these reports was released to the public during the comment period. (Id. at 180-358.) Conserva-tion Congress submitted additional comments on July 16, 2004. (Id. at 175-79.) Finally, on September 2, 2004, the EA, with supporting expert reports, the FONSI, and the Decision Notice for the Eagle Ranch project were released to the public. (Id. at 359-64.) Conservation Congress appealed the decision. (Id. at 400-13.) The appeal was denied by the Forest Service on December 2, 2004. (Id. at 416-23.)

### 2. Powder Project

The Powder Vegetation and Fuels Management Project was initially proposed in 1998. (Id. at 100001-10.) The Powder project involves timber harvesting and fuels treatment on approximately 3,655 acres of National Forest for the purpose of improving forest health and preventing wildfires. (Id. at 100081-82.) A Biological Assessment was completed on April 11, 2003, and reports on the cultural and archeological impacts of the project were prepared during the summer and fall of 2003. (Id. at 100019-30; 100034-53; 100059-77.) On December 2, 2003, the Forest Service sent out a two-page public scoping letter for

the Powder project, with a brief description of the proposed action and its purpose and need. (Id. at 100081-83.) The stated purpose for the project is to thin the timber to reduce inter-tree competition, reduce wildfire risk, and maintain habitat for the northern spotted owl and northern goshawk. (Id.) The letter did not refer to any of the environmental reports already prepared for the project, and none of these reports was released. The Klamath Forest Alliance submitted comments in response to this scoping letter. (Id. at 100089-90.) On April 15, 2004, the Forest Service initiated the § 215.6 public comment period with a two-page letter, including a one paragraph description of the project. (Id. at 100107-21; 100127-39.) Both Klamath Forest Alliance and Conservation Congress submitted comments during this second public comment period. (Id. at 100136-46.) By the end of the second public comment period, another four expert reports were completed, but not released to the public, and, subsequently, another three expert reports were prepared. (Id. at 10096-104; 100107-21; 100127-34; 10036-39; 10058-84; 10087-88; 100189-207.) The EA, FONSI, and Decision Notice for the Powder project were released to the public on September 3, 2004. (Id. at 100283-91.) Conservation Congress and Klamath Forest Alliance appealed the Forest Service decision, but that appeal was denied on December 8, 2004. (Id. at 100302-29.)

### 3. The Edson Project

The Edson project was initiated on August 8, 2003 with a two-page public scoping letter that generally described the

7

project but provided no information about its environmental impacts. (Id. at 200011-12.)  The Edson project involves timber harvesting on slightly more than 2,000 acres. (Id.)  The stated purpose of the project is to maintain forest health and diversity, provide habitat, reduce the risk of wildfires, and produce a yield of wood products. (Id.)  One component of the project is to remove diseased and infected trees. (Id.)  The Klamath Forest Alliance submitted comments in response to the scoping notice on August 19, 2003. (Id. at 200014-15.)  The soils report and biological evaluation for the project were completed in March 2004 but were not released to the public. (Id. at 200031-44; 200050-70.)  The § 215.6 comment period was initiated on March 25, 2004, and both the Klamath Forest Alliance and Conservation Congress submitted comments. (Id. at 200072-77.)  The letter initiating the § 215.6 comment period was somewhat more comprehensive than the letters sent out for the other projects and included a description of proposed mitigation measures and alternatives, although the letter did not refer to the expert environmental reports already completed and did not discuss cumulative impacts. (Id.)  Nine more expert reports were completed for the Edson project during the spring and summer of 2004. (Id. at 200101-04; 200120; 200125-97; 200213-17; 200232-45.)  On August 13, 2004, the Forest Service issued an EA, FONSI, and Decision Notice for the project. (Id. at 200246-87.) Conservation Congress appealed the project approval, but the appeal was denied on October 22, 2004. (Id. at 200292-305.)

Plaintiffs Conservation Congress, Klamath Forest Alliance, and Citizens for Better Forestry filed this action on January 13, 2005, alleging that the Forest Service violated NEPA by approving the three projects without providing adequate public participation in the environmental review process. (<u>Conservation</u> Compl. ¶¶ 30-37.) Plaintiffs seek: (1) a declaration that the Forest Service violated NEPA in approving the three projects; (2) an order requiring the Forest Service to provide a meaningful opportunity for public comments on the EAs; and (3) an injunction against implementation of the projects until the Forest Service complies with the requirements of NEPA.

II.

<u>A. NEPA</u>

Plaintiffs in both cases allege that the Forest Service violated NEPA by failing to adequately involve and inform the public in the preparation and consideration of the EA for each of the projects.[4]  Defendants counter that NEPA does not require circulation of a draft EA and that the Forest Service complied with NEPA's public notice and participation requirements by: (1) distributing a scoping letter and inviting comment; and (2) disclosing the EA after it was finalized. To prevail, plaintiffs must show that the agency's action was "arbitrary and capricious, an abuse of discretion, or contrary to law." 5 U.S.C. §

---

[4] Klamath Forest Alliance did not exhaust administrative remedies as to the Eagle Ranch and Edson projects. (<u>Conservation</u> Def.'s Reply at 10-11.)  Therefore, the claims of Klamath Forest Alliance as to the Eagle Ranch and Edson projects are DISMISSED.

9

706(2)(A). An agency decision taken without the required procedure is "contrary to law." <u>Idaho Sporting Cong. Inc. v. Alexander</u>, 222 F.3d 562, 567 (9th Cir. 2000).

NEPA is designed to ensure a process and not to produce a particular result. <u>See, e.g.</u>, <u>Inland Empire Pub. Lands Council v. United States Forest Serv.</u>, 88 F.3d 754, 758 (9th Cir. 1996). NEPA seeks informed agency decision-making through informed public participation. <u>Id.</u>; <u>Robertson v. Methow Citizens Council</u>, 490 U.S. 332, 349, 109 S.Ct. 1835 (1989); <u>Citizens for Better Forestry v. USDA</u>, 341 F.3d 961, 970-71 (9th Cir. 2003) ("<u>CBF</u>"), quoting <u>Okanogan Highlands Alliance v. Williams</u>, 236 F.3d 468, 473 (9th Cir. 2000) ("[T]he very purpose of NEPA . . . is to 'ensure [] that federal agencies are informed of environmental consequences before making decisions and that the information is available to the public.'").

The Council on Environmental Quality ("CEQ") is charged with promulgating regulations to ensure that the policies and requirements of NEPA will be carried out by federal agencies. 42 U.S.C. § 4344. These regulations require give and take between an agency and members of the public. <u>See</u> 40 C.F.R. §§ 1500.1(b) ("public scrutiny [is] essential"), 1500.2(d) (the agency must "encourage and facilitate public involvement"), 1501.4 (the agency must "involve the public, to the extent practicable, in preparing [EAs]"), 1506.6 (the agency must "make diligent efforts to involve the public" in preparing environmental documents, give "public notice of . . . the availability of environmental

10

documents so as to inform those persons . . . who may be interested or affected," and "solicit appropriate information from the public.") (2004). The CEQ Regulations are mandatory, not hortatory. CBF, 341 F.3d at 970. They require that an agency give environmental information to the public and then provide an opportunity for informed comments to the agency. See 40 C.F.R. §§ 1501.4, 1506.6. This process of disclosing information to the public must occur before the agency has reached its final decision on whether to go forward with the project. Id. § 1500.1(b).

There are two kinds of environmental documents contemplated by NEPA and the CEQ regulations: an EA and an EIS. An EIS must be prepared for "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(c). "An EIS is a thorough analysis of the potential environmental impacts that 'provide[s] full and fair discussion of significant environmental impacts and . . . informs[s] decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment.'" Klamath-Siskiyou Wildlands Ctr. v. BLM, 387 F.3d 989, 993 (9th Cir. 2004), quoting 40 C.F.R. § 1502.1 (2004). The regulations require that a draft EIS be circulated to the public for comment before it is adopted as the decision of the agency. 40 C.F.R. §§ 1503.1-1503.4 (2004).

The EA is a more concise document whose purpose is to "[b]riefly provide sufficient evidence and analysis for

11

determining whether to prepare an environmental impact statement." Id. § 1508.9.  The EA has become the predominant environmental document under NEPA; in a typical year, 45,000 EAs are prepared, compared to just 450 EISs.  Native Ecosystems Council v. Dombeck, 304 F.3d 886, 896 (9th Cir. 2002).  Under the CEQ regulations, an EA must contain a discussion of the need for the proposed action, potential alternatives to the project, a discussion of the environmental impacts of the project and the alternatives, and a list of agencies and persons consulted.  Id. Under the case law, an EA that is followed by a FONSI must provide sufficient information and detail to demonstrate that the agency took the required "hard look" at the environmental consequences of the project before concluding that those impacts were insignificant.  Save the Yaak Comm. v. Block, 840 F.2d 714, 717 (9th Cir. 1988).  To be adequate, an EA, like an EIS, must analyze cumulative impacts and respond to public comments concerning the project.  Found. for North Am. Sheep, 681 F.2d at 1178; Native Ecosystems, 304 F.3d at 896.  Furthermore, the conclusions in the EA must be supported by "some quantified or detailed information," and the underlying environmental data relied upon to support the expert conclusions must be made available to the public.  Klamath-Siskyou, 387 F.3d at 993, 996. In contrast to an EIS, the CEQ regulations do not expressly require that a draft EA be circulated to the public for comment before the agency adopts it as its final decision.

The question presented here is whether the Forest Service's

12

actions -- issuing an initial scoping notice for public comment and releasing a final EA to the public -- satisfy the mandatory public involvement requirements. The parties are at the extreme ends of the spectrum on this question. According to plaintiffs, nothing short of circulation of a draft EA will satisfy the regulations. According to the Forest Service, all that it must do is to make the public aware that a project is under consideration, permit public comment, and make the EA available once it is completed.

The court finds that although the CEQ regulations do not require circulation of a draft EA, they do require that the public be given as much environmental information as is practicable, prior to completion of the EA, so that the public has a sufficient basis to address those subject areas that the agency must consider in preparing the EA. Depending on the circumstances, the agency could provide adequate information through public meetings or by a reasonably thorough scoping notice. The way in which the information is provided is less important than that a sufficient amount of environmental information -- as much as practicable -- be provided so that a member of the public can weigh in on the significant decisions that the agency will make in preparing the EA. Of course, to be on the safe side, the agency can never go wrong by releasing a draft EA, and supporting documents, as was the practice until recently. See 36 C.F.R. § 215.5(b)(2)(i) (1994).

The court's interpretation of the regulations is consistent

13

1   with the case law.  Two circuit courts have expressly held that
2   the CEQ regulations do not require circulation of a draft EA.
3   <u>Greater Yellowstone Coalition v. Flowers</u>, 359 F.3d 1257, 1279
4   (10th Cir. 2004); <u>Alliance to Protect Nantucket Sound v. United</u>
5   <u>States Dep't of Army</u>; 398 F.3d 105, 115 (1st Cir. 2005). However,
6   in both cases it appears that there were considerable efforts
7   undertaken to inform the public.  <u>Greater Yellowstone</u>, 359 F.3d
8   at 1278, 1279 n. 18 (series of meetings were held with
9   environmental groups and the proposal was modified as a result);
10  <u>Alliance</u>, 398 F.3d at 115 (agency provided a five-month comment
11  period and held two public meetings).  Similarly, the Ninth
12  Circuit has held that the CEQ regulations require the agency to
13  give the public adequate information to comment on projects.  In
14  <u>CBF</u>, the court held that the CEQ regulations are mandatory,
15  noting that "[a]lthough we have not established a minimum level
16  of public comment and participation required by the regulations
17  governing the EA and FONSI process, we clearly have held that the
18  regulations at issue must mean something."  <u>CBF</u>, 341 F.3d at 970.
19  The court went on to hold that "a complete failure to involve or
20  even inform the public about an agency's preparation of an EA and
21  a FONSI . . . violates" the regulations.  <u>Id.</u>  While finding that
22  a complete failure to involve the public  violates the
23  regulations, the court did not hold that the regulations require
24  that the agency must always circulate a draft EA for public
25  comment; the court's passing comment to this effect is dicta.
26  <u>See</u> <u>id.</u> ("[w]e have previously interpreted the[][CEQ] regulations

to mean that '[t]he public must be given an opportunity to comment on draft EAs and EISs'."). But what seems fairly drawn from the case law and the CEQ regulations is that the agency must offer significant pre-decisional opportunities for informed public involvement in the environmental review process by releasing sufficient environmental information about the various topics that the agency must address in the EA, such as cumulative impacts, before the EA is finalized.

In each of the projects under review here, the Forest Service failed to give the public an adequate pre-decisional opportunity for informed comment. For the North 49 project, the thirteen-page project description available at the scoping stage, with its meager environmental analysis, was not the functional equivalent of a draft EA or the three-hundred and fifty pages of environmental documentation ultimately prepared by the Forest Service. While the "purpose and need" section of the EA was virtually identical to the information in the scoping notice, the scoping notice lacked other critical elements included in the EA. (Sierra AR 2-14; 416-22.) The scoping notice provided no environmental data concerning impacts to wildlife, cultural resources, watersheds, soils, fisheries, and aquatics. (Id. at 7-10.) These environmental impacts were only explored in the nine expert reports and 28 pages of analysis in the EA. (Id. at 435-63.) Moreover, the scoping notice contained no discussion or analysis of potential cumulative impacts, while the EA contained eight pages of discussion on this required topic. For these

reasons, the scoping notice did not give the public adequate information to effectively participate in the decision-making process leading up to the final decision.

The scoping notices for the Eagle Ranch, Powder, and Edson projects similarly contained no analysis of the environmental impacts of the projects.[5] (Conservation AR 21-24; 100081-83; 200011-12.) For the Eagle Ranch project, eleven expert reports were eventually prepared in addition to the EA, with a total of 296 pages addressing the potential environmental impacts of the project. Similarly, for the Powder project, eleven expert reports were prepared in addition to the EA, with a total of 214 pages of analysis. Finally, for the Edson project, eleven expert reports were prepared in addition to the EA, for a total of 178 pages of environmental analysis. When compared with the extensive environmental analysis eventually produced, the two-and three-page public scoping notices were not adequate to inform the public of the kinds of data and information that the agency would rely on in the preparation of the EA.

Moreover, what is striking for all three of these projects is the agency's withholding of already-prepared environmental documents even though the documents were completed before the end of the public comment period. The Forest Service had completed

---

[5] Although the § 215.6 letter for the Edson project did provide some information about the environmental impacts of that project, proposed alternatives, and suggested mitigation measures, the letter preceded the majority of the expert reports for the project and did not provide any of the underlying data to support its conclusions.

16

parts of the environmental review for the Eagle Ranch, Powder, and Edson projects before the public scoping periods were initiated. In the case of the Eagle Ranch project, the Forest Service had already completed the EA before the end of the § 215.6 comment period. Yet the Forest Service provides no explanation as to why these documents could not have been released to the public when completed or, at the very least, been discussed and summarized in the public scoping notice. This failure to provide essential information, already in the hands of the agency, does not comply with the agency's requirement of involving the public "to the extent practicable." 40 C.F.R. § 1501.4.

    The agency's failure to provide for effective pre-decisional public involvement in preparation of the EAs for the North 49, Eagle Ranch, Powder, and Edson projects is "contrary to law" under the APA. Therefore, plaintiffs' motions for summary judgment are GRANTED.[6]

### B. Injunctive Relief

The Forest Service requests that the court not enjoin

---

[6] Because the court grants the Sierra Nevada plaintiffs' motion for summary judgment on the NEPA claim, it need not reach plaintiffs' second and third claims relating to the Appeals Reform Act. As the environmental review process will now begin anew, the question of whether dismissal of plaintiffs' appeals was contrary to law has become moot. In declining to decide these claims, the court is proceeding on the assumption that all those who participate in the new environmental review process will be permitted to appeal.

implementation of the Eagle Ranch, Powder, and Edson projects while an appropriate environmental review is conducted.[7] (<u>Conservation</u> Def.'s Mot. at 35-38.)  An injunction is an appropriate remedy where plaintiffs can demonstrate irreparable injury and the inadequacy of a legal remedy.  <u>Weinberger v. Romero-Barcelo</u>, 456 U.S. 305, 312, 102 S.Ct. 1798 (1982). Injunctions are a common remedy in environmental cases because of the often irreparable nature of environmental injuries and the inadequacy of money damages to remedy such injuries.  <u>Amoco Prod. Co. v. Village of Gamball</u>, 480 U.S. 531, 545, 107 S.Ct. 1396 (1987).  While an injunction should not automatically issue with the finding of a NEPA violation, a NEPA violation supports a finding of irreparable harm, given the risk to the environment from uninformed decision-making.  <u>High Sierra Hikers Ass'n v. Blackwell</u>, 390 F.3d 630, 642 (9th Cir. 2004); <u>Idaho Sporting Cong.</u>, 222 F.3d at 569.

   The Forest Service argues that this case is different because harm to the environment will result if an injunction is issued.  Where parties make competing claims of injury, the court must balance the injuries, giving due consideration to the public interest, if any, at stake.  <u>Weinberger</u>, 456 U.S. at 312.  The balance of harms in this case weighs in favor of granting an injunction.  Although defendants argue that the Shasta-Trinity National Forest will suffer irreparable injury if the projects do

---

[7] In the <u>Sierra Nevada</u> case, the Forest Service does not dispute that an injunction is the appropriate remedy.

18

not go forward, the court's injunction will only delay the projects temporarily, not permanently, assuming the Forest Service continues to approve the projects. Even accepting defendant's proposition that such projects are seasonal, the new environmental review process would delay the project until next summer at the latest. Moreover, the record reveals that, until this point, the Forest Service has not considered these projects urgent; for instance, the Eagle Ranch project was initially proposed in 1998. All of the projects are of small scale and likely would be finished before further environmental review could be completed. Finally, although one of the goals of the Edson project is to prevent on-going tree mortality by harvesting insect infested trees, the Forest Service has not provided any data, or even a declaration, to substantiate its claim that the infestation is spreading rapidly or endangering the value of the timber.

If the court permits these projects to go forward without informed public comment, the new environmental review process ordered by the court will be a pointless exercise. To afford plaintiffs any relief and to ensure that the procedural goals of NEPA are served, these projects must be enjoined.

\\\
\\\
\\\
\\\
\\\

III.

For the foregoing reasons, plaintiffs' motions for summary judgment are GRANTED, and defendants' cross-motions for summary judgment are DENIED.  Defendants are enjoined from further implementing the North 49, Eagle Ranch, Powder, and Edson projects unless and until the Forest Service complies with the requirements of NEPA, as set forth in this order.

IT IS SO ORDERED.

Dated: June 30, 2005

```
         _____/s/_____
         DAVID F. LEVI
         United States District Judge
```